[Cite as *In re V.G.*, 2021-Ohio-3554.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

IN RE:

    V.G.,

CASE NO.  8-20-57

**DEPENDENT CHILD.**

**O P I N I O N**

[CHEYENNE O. - APPELLANT]

**Appeal from Logan County Common Pleas Court
Juvenile Division
Trial Court No. 18-CS-19**

**Judgment Affirmed**

**Date of Decision:   October 4, 2021**

**APPEARANCES:**

    *Alison Boggs* **for Appellant**

    *Stacia L. Rapp* **for Appellee**

**MILLER, J.**

{¶1} Mother-appellant, Cheyenne O., appeals the October 6, 2020 judgment of the Logan County Court of Common Pleas, Juvenile Division, granting permanent custody of her biological child, V.G., to appellee, Logan County Children's Services ("the Agency"). For the reasons that follow, we affirm.

### Facts and Procedural History

{¶2} Cheyenne and Brendon G. are the biological parents of V.G., born March 2018. On March 13, 2018, the Agency simultaneously filed a motion for emergency custody and a complaint for temporary custody of V.G., alleging that he was an abused and dependent child. Specifically, the complaint alleged that the Agency received a referral from a mandated reporter at Mary Rutan Hospital after Cheyenne sought treatment on March 10, 2018 due to complications with her pregnancy and tested positive for cocaine, phencyclidine, and benzodiazepine. Cheyenne was transferred to another hospital where she delivered V.G. at 35 weeks and 4 days gestation. V.G.'s cord blood tested positive for cocaine, methadone, diazepam, nordiazepam, and phenergan. Additionally, the complaint alleged that V.G. exhibited withdrawal symptoms consisting of high-pitched cries, tremors, not sleeping, splotchy skin, sneezing, fever, and regurgitation. V.G. was treated with morphine and remained in the hospital for several days. Concerns regarding Cheyenne's mental health, including a history of depression, anxiety, panic attacks,

post-traumatic stress disorder, and bipolar disorder, were also included in the complaint. On March 12, 2018, the Agency confirmed the referral information with the hospital and requested a verbal order of removal, which the trial court granted. At a hearing the next day, the trial court upheld the removal and granted the Agency's request for emergency and temporary custody of V.G. The trial court also made a finding that the Agency made reasonable efforts to prevent V.G.'s removal. The parents were granted supervised parenting time with V.G. as approved and arranged by the Agency.

{¶3} On April 11, 2018, the Agency filed its first case plan. The case plan identified the Agency's concerns regarding Cheyenne's drug use, mental health, lack of knowledge in parenting skills, association with known drug users, and lack of housing and income stability. To alleviate the concerns, the case plan required Cheyenne, in part, to complete drug and alcohol and mental health assessments, participate in counseling to address drug-abuse concerns, obtain and maintain employment and suitable housing, and engage in parenting classes. The case plan also required Cheyenne to sign releases of information and comply with random drug testing as deemed necessary by the Agency or drug and alcohol counselors.

{¶4} At the adjudication hearing held on April 24, 2018, the parties stipulated that V.G. was a dependent child pursuant to R.C. 2151.04(B) and (C), and the trial court found V.G. was a dependent child pursuant to that admission. Upon motion

of the Agency, and without objection, the allegations in the complaint alleging that V.G. was an abused child were dismissed by the trial court. The parents were further ordered to schedule an appointment with the family court treatment coordinator for potential admission into the program. The judgment entry reflecting the trial court's findings was filed on May 17, 2018.

{¶5} On May 17, 2018, the Agency filed amended case plan 1.01 which indicated that the kinship provider was no longer able to provide care for V.G. and that, accordingly, V.G. was now placed in a licensed foster home. The amended case plan reflected that V.G. was familiar with the foster parents because they had been his babysitters. At the disposition hearing on May 29, 2018, the magistrate conducting the hearing recommended V.G. remain in the temporary custody of the Agency. The parents were awarded supervised visitation with V.G. as approved and arranged by the Agency. Further, pursuant to the agreement of the parties, the magistrate found that the Agency made reasonable efforts to eliminate the need for V.G.'s continued removal from his parents' home. Cheyenne was also ordered to participate in family treatment court ("FTC") to address her continued substance abuse. The judgment entry reflecting the magistrate's findings and recommendations was filed on July 10, 2018. On July 13, 2018, the trial court adopted the magistrate's findings and recommendations.

{¶6} The Agency conducted a semi-annual review on September 6, 2018. The review indicated that Cheyenne was in FTC and was serving several days in local incarceration for having drug screens showing her use of illegal substances. The review further stated that Cheyenne's visits with V.G. were suspended prior to her incarceration due to her continued substance use and would be reinstated once she returned clean drug screens for two weeks; however, she was not yet successful in meeting that requirement. Cheyenne planned to complete inpatient substance-abuse treatment.

{¶7} On November 27, 2018, the Agency filed a status-review summary which indicated Cheyenne was in a residential treatment program and that she had several supervised visits with V.G. while there. The Agency recommended that V.G. continue in the temporary custody of the Agency with Brendon receiving unsupervised visits. The Agency recommended that Cheyenne continue supervised visitation with V.G.

{¶8} On February 19, 2019, the Agency filed a status-review summary which indicated that Cheyenne was again in local incarceration following a traffic violation where law enforcement officers found illegal substances on her person while she was driving without a valid driver's license. The Agency recommended V.G. continue in its temporary custody with the parents receiving supervised visitation.

The Agency further recommended that Cheyenne engage in and successfully complete residential treatment.

{¶9} At the annual-review hearing held on February 19, 2019, the trial court approved the Agency's annual-review summary. The trial court also granted the Agency's motion for extension of temporary custody. Accordingly, the Agency was maintained as the temporary custodian of V.G. with the parents awarded supervised parenting time as approved and arranged by the Agency. With the agreement of the parents, the trial court made another reasonable efforts determination.

{¶10} In a status-review summary filed on April 2, 2019, the Agency indicated Cheyenne was again admitted to a residential treatment center on March 15, 2019 after a diagnostic assessment determined she met the criteria for substance-use-disorder treatment. The Agency recommended V.G. continue in its custody with Brendon receiving one supervised visit and one unsupervised visit each week. The Agency recommended Cheyenne complete residential treatment prior to recommencing visitation with V.G.

{¶11} On April 9, 2019, Brendon filed an objection to the status-review summary. At a hearing that same day, the trial court approved the semi-annual review as amended on the record. On May 1, 2019, Cheyenne was terminated unsuccessfully from FTC due to a new felony drug-related charge in Logan County.

{¶12} The Agency conducted a three-month case review on June 5, 2019. The review indicated that Cheyenne successfully completed in-patient substance abuse treatment and was now actively involved in adult recovery court. The Agency reported that Cheyenne and Brendon had one supervised visitation per week and Brendon had an additional weekly unsupervised visitation.

{¶13} On August 1, 2019, the Agency filed a motion for final extension of temporary custody. On September 6, 2019, the Agency conducted a semi-annual review. In the review, the Agency reported that Cheyenne had been compliant with adult recovery court and her case plan, but was arrested on August 22, 2019 for a probation violation for abusing substances. The report indicated Cheyenne was terminated from adult recovery court, and planned on living in a homeless shelter upon release from jail. The Agency indicated it continued to be concerned about Cheyenne's substance abuse and mental health. The Agency also detailed concerns regarding anger outbursts and domestic violence between Cheyenne and Brendon.

{¶14} On August 27, 2019, a hearing was held on the Agency's motion for final extension of temporary custody. Following the hearing, the trial court ordered the Agency be maintained as temporary custodian of V.G. Further, the trial court awarded Cheyenne supervised parenting time as approved and arranged by the Agency upon her release from incarceration. The trial court found the Agency made reasonable efforts to prevent V.G.'s continued removal from his parents.

{¶15} On September 16, 2019, the Agency filed amended case plan 1.02. The amended case plan included additional objectives for Brendon, including engaging in V.G.'s medical and therapy appointments and participating in anger management services. On December 18, 2019, the trial court approved amended case plan 1.02.

{¶16} On December 23, 2019, the Agency moved the trial court for an order granting it permanent custody of V.G. The trial court scheduled a two-day hearing on the Agency's motion for permanent custody for March 31, 2020 and April 1, 2020. On February 19, 2020, the Agency filed a notice with the trial court stating that it completed an assessment of Brendon's home and is unable to approve the home assessment based on the conditions of the home, safety of the child, Brendon's ability to care for the child, and persons living in the home.

{¶17} On February 27, 2020, the Agency completed a three-month case review and a semi-annual review. In the review documents, the Agency detailed its continuing concerns regarding Cheyenne's mental health and substance use. The Agency also detailed concerns regarding the condition of Brendon's home and his parenting practices, maturity, and ability to manage V.G.'s medical and therapy appointments. That same day, the final annual court review was held. At the review, the trial court and the parties reviewed the home study filed for Brendon and the semi-annual review. The parents indicated they disagreed with the contents

of the home study and both parties contested that the Agency employed reasonable efforts to prevent V.G.'s continued removal. Cheyenne also indicated she did not agree with the Agency's assessment in the semi-annual review.

{¶18} On March 23, 2020, Brendon filed a motion for custody of V.G. wherein he alleged it was in V.G.'s best interest that he be granted temporary and permanent sole custody of V.G.

{¶19} On March 30, 2020, the trial court filed a judgment entry detailing a telephonic conference it held with counsel to discuss the potential health concerns regarding holding the permanent custody hearing in light of the growing COVID-19 public health crisis. During the conference, the attorneys acknowledged that Cheyenne was pregnant and living with a preexisting medical condition, making her part of the population at high risk for severe complications from COVID-19. The judgment entry indicated that trial counsel for the parents expressed support for the continuance of the hearing on the motion for permanent custody on behalf of their clients. Counsel for the Agency stated that she would not voluntarily consent to a continuance but would not oppose the trial court's decision to continue the hearing. Thereafter, the trial court determined the COVID-19 public health crisis and Cheyenne's high-risk status constituted good cause to continue the hearing on the Agency's motion for permanent custody. Furthermore, Brendon had recently retained new counsel and the trial court found the continuance afforded his new

counsel the opportunity to prepare for the hearing. The trial court rescheduled the hearing on the Agency's motion for permanent custody and Brendon's motion for custody for May 12 and 13, 2020.

{¶20} On March 30, 2020, the Agency filed amended case plan 2.0, in which it expressed its desire for the trial court to grant the Agency permanent custody and stated its permanency goal of adoption.

{¶21} The first two days of the permanent custody hearing were held on May 12 and 13, 2020. All of the parties and their attorneys appeared in person for the hearing, with the exception of Cheyenne's trial counsel who appeared by telephone due to health concerns regarding the COVID-19 health crisis. At the commencement of the hearing on May 12, 2020, Brendon's trial counsel and counsel for the Agency moved for a continuance to a later date to permit Cheyenne's trial counsel to attend the hearing in person or, in the alternate, to permit the trial court to appoint new trial counsel for Cheyenne who could appear in-person at the permanent custody hearing. The trial court denied the motion and the permanent custody hearing proceeded on May 12 and 13, 2020, with Cheyenne's trial counsel appearing telephonically. The hearing was unable to be completed in the two days allotted, and the permanent custody hearing continued on July 29, 2020, August 6, 2020, and September 8, 2020, with all parties, including Cheyenne's trial counsel, physically present in the courtroom.

{¶22} In a judgment entry filed on October 6, 2020, the trial court found the Agency made reasonable efforts to prevent the removal of V.G. or to return V.G. to the custody of his Mother. The trial court granted the Agency's motion for permanent custody and denied the parents' motions for legal custody. The trial court also approved amended case plan 2.0, which was filed on March 30, 2020.

{¶23} On October 16, 2020, Cheyenne filed her notice of appeal. She raises four assignments of error for our review.

**Assignment of Error No. I**

**The trial court's decision granting permanent custody was against the manifest weight of the evidence and amounted to an abuse of discretion.**

{¶24} In her first assignment of error, Cheyenne argues the trial court's decision granting permanent custody of V.G. to the Agency is against the manifest weight of the evidence. Specifically, Cheyenne challenges the trial court's determinations that granting the Agency permanent custody of V.G. was in the child's best interest and that V.G. could not be reunited with Cheyenne in a reasonable amount of time.

*Standard of Review*

{¶25} "When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court '"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and

determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'" *In re Dn.R.*, 3d Dist. Shelby No. 17-20-06, 2020-Ohio-6794, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶26} In a permanent-custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 43. "Clear and convincing evidence" is the "'measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.'" *In re Dn.R.* at ¶ 17, quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986). "In determining whether a trial court based its decision upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Id.* at ¶ 18, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of

fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013-Ohio-3588, ¶ 55.

{¶27} "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record." *In re S.D.*, 5th Dist. Stark No. 2106 CA 00124, 2016-Ohio-7057, ¶ 20. "A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].""" *In re Dn.R.* at ¶ 19, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

*Applicable Law*

{¶28} The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "Parents have a 'fundamental liberty interest' in the care, custody and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 3d Dist. Hancock No. 5-03-08, 2003-Ohio-5885, ¶ 7. These rights may be terminated under appropriate

circumstances and when the trial court has met all due process requirements. *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53, and 5-02-54, 2003-Ohio-1269, ¶ 6.

{¶29} R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding. *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08 and 3-17-09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13. "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10.

{¶30} The first prong of the test requires a finding by clear and convincing evidence that there exists one of the statutorily-prescribed situations of R.C. 2151.414(B)(1). As relevant to this case, R.C. 2151.414(B)(1) provides:

> [T]he court may grant permanent custody of a child to a movant if the court determines at a hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or months of a consecutive twenty-two month period * * *.

R.C. 2151.414(B)(1)(d).

**{¶31}** "If the trial court determines *any* provision enumerated in R.C. 2151.414(B)(1) applies," it must proceed to the second prong of the test, which requires the trial court to "determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest." (Emphasis sic.) *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 55; *see* R.C. 2151.414(B)(1). The best interest determination is based on an analysis of R.C. 2151.414(D).

**{¶32}** Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors. *In re H.M.*, 3d Dist. Logan Nos. 8-13-11, 8-13-12, 8-13-13, 2014-Ohio-755, ¶ 27. The factors of R.C. 2151.414(D)(1) include:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)   Whether any of the factors in [R.C. 2151.414(E)(7)-(11)] apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶33} If the trial court makes the required statutory determinations, a reviewing court will not reverse a trial court's decision regarding permanent custody unless it is not supported by clear and convincing evidence. *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 43.

*Analysis*

{¶34} In its judgment entry granting permanent custody of V.G. to the Agency, the trial court made the following findings under 2151.414(B)(1):

The State's motion asserts that LCCS is a public children's services agency that has had temporary custody of V.G. for twelve or more months of a consecutive twenty-two (22) month period which is one of the conditions listed in R.C. 2151.414(B)(1), namely paragraph (d). Child V.G. was removed from his Mother's legal custody on March 12, 2018, and has been in the temporary custody of the Agency since then without interruption. Therefore, the Court FINDS that the Agency has met its burden by clear and convincing evidence.

(Doc. No. 273).

{¶35} Cheyenne does not dispute that V.G. had been in the temporary custody of the Agency for more than twelve consecutive months of the previous twenty-two months. Thus, she does not contest the trial court's finding that R.C. 2151.414(B)(1)(d) was satisfied in this matter. Rather, Cheyenne disputes the trial court's best-interest determination.

{¶36} With respect to the best interest factors under R.C. 2151.414(D)(1), the trial court made the following findings:

> Provided the first prong is satisfied, the Agency must prove, by clear and convincing evidence, that granting permanent custody of the child is in the child's best interest. Best interest determinations are based on an examination of R.C. 2151.414(D), and any other relevant factors.
>
> The evidence established that Father, more so than Mother, is bonded with their son. This makes sense in light of the history of the case. The parenting time between Father and V.G. did not progress to overnight visitations. Father gave up his unsupervised parenting time to assist Mother with her supervised time at the Agency.
>
> Both Foster Moms have a strong bond with V.G. due to the time they have spent caring for his needs, which include multiple weekly therapies critical to his development.
>
> V.G. is too young to express his wishes. The Guardian Ad Litem strongly supports the granting of permanent custody on the child's behalf.
>
> V.G. has been in the temporary legal custody of the Agency since his birth- thirty plus months now.
>
> V.G. is in need of a legally secure placement which can only be achieved by the Foster Moms who have demonstrated a fierce commitment to the health challenges that V.G. faces and continues to

face. Neither Mother nor Father have demonstrated an ability to work with health care professionals and implement the therapeutic course of treatments that are so crucial to V.G.'s development. State's Exhibit 1 supports this. Father is not equipped to meet the needs of V.G. who is a medically fragile child and Mother has only attained stability recently. A second child is on the way which will also place demands on both parents. The Court FINDS that the risk is too high to hope that either parent can guarantee that V.G. will not miss any appointments. Both parents were resistant to their own respective case plan objectives. V.G. is young and any lapse or cessation in treatment will jeopardize his future. The current placement for the child is consistent with the best interest, welfare, and special needs of V.G., and is in the most family-like setting possible. Furthermore, [the Agency] has made reasonable efforts to finalize the permanency plan for V.G.

Despite Mother's progress, the Court has major concerns. The parents did not consistently engage in the services to alleviate the concerns that led to the removal of V.G. The lack of consistency is a major concern because V.G. must be able to rely on others to meet his needs and neither parent has the ability to do so on a permanent basis.

Having considered all of the best interest factors, although each factor may not be specifically enumerated herein, the Court FINDS that the Agency has met its burden of proof by clear and convincing evidence as to the second prong.

(Doc. No. 273).

{¶37} Cheyenne argues that the trial court's decision to grant permanent custody to the Agency is against the manifest weight of the evidence because the record does not support the trial court's findings under R.C. 2151.414(D). However, after reviewing the record, we find that the trial court's findings with respect to best interest are supported by clear and convincing evidence.

*The Child's Interaction/Interrelationship*

{¶38} R.C. 2151.414(D)(1)(a) requires the trial court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." According to Cheyenne, the evidence offered at trial demonstrated that she was appropriate with V.G. during in-person visitations and was the parent primarily in charge of caring for V.G. when Cheyenne and Brendon shared joint supervised visitations. Cheyenne argued that "[s]he is as bonded as she can be, seeing her child in a supervised, limited environment, and then after [the COVID-19 health crisis] struck, she could only see him on [Z]oom." (Appellant's Brief at 9). Cheyenne argues that although she "certainly missed visits when she was in jail and rehab," she had not missed visitations since the fall of 2019. (*Id.*). Cheyenne acknowledges that V.G. is bonded with the foster parents, but argues that the Agency had the discretion to increase her visitations and did not do so and asserts that "had her ability to have visits increased * * * the additional contact only would have made the bond [between Cheyenne and V.G.] stronger." (*Id.* at 10). Cheyenne states that this factor "is a wash" and "does not weigh in greater favor of the foster parents' bond and * * * does not weigh against [her] merely because she has not had the opportunity to spend much time with V.G. to [deepen] the bond they share." (*Id.*).

{¶39} At the hearing, Emily Rea, the Agency's case manager who supervised Cheyenne and Brendon's visitations from November 2019 to March 2020, testified that Cheyenne was appropriate with V.G. and that during the parents' joint-supervised visitations, it was Cheyenne who primarily performed caregiving functions for V.G., such as changing his diaper and planning and supervising his meals. (May 13, 2020 Tr. at 304-305, 312-315, 329-331). Rea also testified that Cheyenne attempted to play with V.G., with varying success. (*Id.* at 312-313, 331). Further, Rea stated that V.G. appeared happy to see his biological parents during visitation. (*Id.* at 321-323). Specifically, Rea testified that V.G. would sometimes cry when she picked him up from the foster parents' home and would start to settle down when he arrived at the visitation room with his biological parents. (*Id.* at 323-324, 329).

{¶40} On the other hand, according to Rea, Brendon appeared to have a stronger bond with V.G. than Cheyenne. (*Id.* at 315). Rea specifically stated that V.G. would often seek out Brendon during the parents' joint visitations and would sometimes "want nothing to do" with Cheyenne. (*Id.* at 311). Further, Rea testified that although she sees more of a bond between V.G. and Brendon than she does between V.G. and Cheyenne, those bonds are "nothing like" the strong bonds she observes between V.G. and his foster parents. (*Id.* at 335). Specifically, Rea juxtaposed V.G.'s reluctance to leave his foster parents and his obvious happiness

upon their reunification compared with his "indifferen[ce]" and lack of "emotional reaction" upon leaving his biological parents at the end of visitations. (*Id.* at 310, 335).

{¶41} Cynthia Smith, the Agency caseworker who oversaw V.G.'s case from its beginning, testified she observed Cheyenne's parenting time with V.G. and is concerned regarding Cheyenne's lack of consistency in building a relationship with V.G. (July 29, 2020 Tr. at 555-556). Smith stated that Cheyenne and V.G. have had to "rebuild their relationship numerous times" due to Cheyenne's lack of visitation consistency resulting from the nine months she spent incarcerated or in substance-abuse treatment during the pendency of the case. (*Id.* at 556). According to Smith, nine of the home visits she conducted in the last two years occurred while Cheyenne was either incarcerated or in rehabilitation facilities and Cheyenne was not exercising visitation with V.G. during those times. (*Id.* at 530). Smith further testified that V.G. tends to gravitate toward Brendon during the biological parents' joint visits because Brendon has "been that consistent person for visitation," and Cheyenne is often bothered by V.G.'s apparent preference for Brendon. (*Id.* at 530, 556). Additionally, the guardian ad litem ("GAL"), who observed V.G. with his foster parents and biological parents testified that although V.G. does not act like his biological parents are "strangers," she is concerned that the biological parents

come and go from V.G.'s life, which affects the bond V.G. is able to establish with his biological parents. (Sept. 8, 2020 Tr. at 717-718).

{¶42} Furthermore, the record reflects the V.G. never lived in the home with his biological parents and was removed from their care in March 2018 while in the hospital following his birth. (May 13, 2020 Tr. at 435-437). Although he was initially placed with a kinship placement upon his release from the hospital, the record reflects that V.G. resided with his foster parents beginning in May 2018 and continuing uninterrupted throughout the proceedings. (*Id.* at 440-441). According to Smith, who had the opportunity to conduct monthly home visits to the foster parents' home, V.G was "very bonded" and "very affectionate" with both of his foster parents. (July 29, 2020 Tr. at 525-526).

{¶43} Additionally, Cheyenne attempts to argue that her relationship with V.G. was stunted by her lack of visitation with the child, a factor that was completely within the control of the Agency, and, the COVID-19 health crisis, which resulted in her visitations reduced to brief, virtual visitations. However, as Smith testified, it was the Agency's position throughout the pendency of the case that it would increase Cheyenne's visitations with V.G. as she progressed in her case plan services, including permitting Cheyenne to attend V.G.'s medical appointments. (*Id.* at 545-546). However, Cheyenne had periods of compliance where she was actively engaged in visitation with V.G, but continued to relapse, which led to her

multiple arrests and the disruption of her visitation. (Aug. 6, 2020 Tr. at 607). With respect to Cheyenne and Brendon's visitation moving from in-person to brief, virtual visitations, the record indicates that Cheyenne and V.G. both have a medical condition that put them at high-risk of complications from COVID-19 and that, at the time of the hearing, the trial court had not yet approved in-person visitations for high-risk individuals, including Cheyenne and V.G. (*Id.* at 674-675). Thus, the decision to move the visitations to virtual visitations was not at the discretion of the Agency, but rather, was in response to the trial court's general policy regarding in-person visitation for high-risk individuals.

***The Child's Wishes & Custodial History of Child***

{¶44} With respect to R.C. 2151.414(D)(1)(b) and (c), the trial court made the following findings:

> V.G. is too young to express his wishes. The Guardian Ad Litem strongly supports the granting of permanent custody on the child's behalf.

> V.G. has been in the temporary custody of the Agency since his birth-thirty plus months now.

(Doc. No. 273). Cheyenne does not challenge these factual findings. Further, the record reflects that the GAL supported the Agency's petition for permanent custody and that, at the time of the permanent custody hearing, V.G. had been in the temporary custody of the Agency for more than 30 months. (Sept. 8, 2020 Tr. at 705); (Doc. Nos. 1, 5, 273).

***Child's Need for a Legally Secure Placement***

{¶45} Under R.C. 2151.414(D)(1)(d), a trial court is required to consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." With respect to this factor, the trial court found that a legally secure placement could only be achieved by the foster parents who "have demonstrated a fierce commitment to the health challenges that V.G. faces and continues to face." (Doc. No. 273). The trial court found that neither Brendon nor Cheyenne had demonstrated the ability to implement the weekly therapies crucial to V.G.'s development. (*Id.*). The trial court noted that Cheyenne "only attained stability recently" and Brendon "is not equipped to meet the needs of V.G. who is a medically fragile child." (*Id.*). The trial court found that the "risk [to V.G.'s development] is too high to hope that either parent can guarantee that V.G. will not miss any appointments" and noted that Cheyenne and Brendon "were resistant to their own respective case plan objectives." (*Id.*).

{¶46} Cheyenne argues the trial court erred by determining that she could not provide V.G. with a legally secure, permanent placement "after all the strides she made" in her case plan and that she "was now prepared to move forward and parent her son." (Appellant's Brief at 11). Specifically, Cheyenne argues that she had made sufficient progress on her case plan to alleviate the initial concerns which

led to V.G.'s removal from her care and that she was now able to provide a legally secure placement for V.G. We disagree.

{¶47} In support of her contention that the trial court erred by determining she could not be considered a legally secure permanent placement for V.G., Cheyenne argues she has alleviated the concerns which led to the removal of V.G. from her care. One of the chief concerns leading to V.G.'s removal from Cheyenne's care was her substance use, including during her pregnancy with V.G. Accordingly, many of Cheyenne's case plan objectives focused on her substance use. At the permanent custody hearing, the Agency presented evidence that Cheyenne struggled with substance abuse throughout the majority of the case and had only recently obtained sobriety. Annette Deao, the treatment and program coordinator of the Logan County Family Treatment Court, testified that she completed a substance abuse assessment of Cheyenne in May 2018 where she learned Cheyenne had a "long history of substance use". (May 12, 2020 Tr. at 211). Deao stated that she referred Cheyenne to FTC in July 2018 and Cheyenne never made it past the first phase of the treatment programs because she "struggled a lot" and had a "lot of relapses." (*Id.* at 213). Some of the relapses included overdoses, automobile accidents, and criminal charges filed against Cheyenne. (*Id.*).

{¶48} Deao testified that due to Cheyenne's continued substance use, she was referred to a residential treatment facility. (*Id.* at 214-215). However,

Cheyenne was unsuccessfully terminated from the four-to-six-month program after approximately seven to eight weeks due to staff finding prohibited items among her personal belongings. (*Id.* at 215-216). Following her termination from the treatment program, Cheyenne was brought back to FTC for a final opportunity to demonstrate compliance. (*Id.* at 216). However, Deao testified that Cheyenne continued to have drug relapses and resulting legal issues and she was terminated from FTC unsuccessfully on December 18, 2018. (*Id.* at 216-217).

{¶49} During her testimony, Cheyenne admitted that she had approximately four relapses in 2018. (Aug. 6, 2020 Tr. at 622). She also admitted that at the beginning of 2019 she overdosed on drugs during a relapse. (*Id.* at 623). After serving approximately two months in jail, she successfully completed a 70-day treatment program. (*Id.* at 623-624). However, Cheyenne admitted that she relapsed in August 2019 and served a jail sentence as a result of her actions. (*Id.* at 627-628). Cheyenne further admitted she drank alcohol at Christmas 2019, a substance which was prohibited under her treatment plan, and that she did not tell the caseworker about her actions. (*Id.* at 655-658). Cheyenne further testified that from the beginning of the case to December 2019, her longest period of sobriety was from January 10, 2019 to August 20, 2019. (*Id.* at 658).

{¶50} Janice Rhoades, the program manager of TCN Behavioral Health and Wellness, testified that Cheyenne has been attending a group session at the facility

since November 2019. (May 12, 2020 Tr. at 82). Rhoades also provided Cheyenne with individual substance abuse counseling beginning in January 2020. (*Id.* at 79). Rhoades testified that, to the best of her knowledge, Cheyenne has remained clean and sober since that time. (*Id.* at 91). However, Rhoades testified she did not believe that Cheyenne was ready to be discharged from services. (*Id.* at 86).

{¶51} However, in addition to substance abuse concerns, the case plan also addressed concerns regarding Cheyenne's stability in other aspects of her life, such as housing and employment. Importantly, at the August 6, 2020 permanent custody hearing, Cheyenne admitted she was not in a financial position to have permanent custody of V.G. (Aug. 6, 2020 Tr. at 631). At that time, she was living in a homeless shelter and did not have permanent housing. (*Id.* at 614-615). However, at the final day of the permanent custody hearing, approximately one month later, she testified that she believed she was in position to support V.G. and wanted to be considered for custody. (Sept. 8, 2020 Tr. at 793). Cheyenne stated she believed that she was "fit now" to have custody of V.G. because she moved into a new apartment one week prior which had ample room for V.G. and was stocked with a crib and baby supplies. (*Id.*).

{¶52} Although Cheyenne argues that the new apartment indicates that she has stable and secure housing for her and V.G., we disagree. At the time of the final hearing, Cheyenne had only been living in the apartment for one week, and thus,

had not demonstrated that it was stable and that she had the ability to maintain it. This is particularly true in light of Cheyenne's admission that her current apartment marked her eighth address in two years. (*Id.* at 793). In fact, the record indicates that during the duration of the permanent custody hearing, Cheyenne lived at three different addresses: a camper at the lake, a homeless shelter, and her current apartment. Further, Cheyenne testified that although she had achieved what she considered stable housing, Brendon was not yet ready to "even think about" residing with her until she was able to "maintain stability" and "stay sober" while she was living on her own. (*Id.* at 796).

{¶53} Additionally, although Cheyenne's case plan required her to maintain stable employment, at the time of the permanent custody hearing, Cheyenne did not have employment so she could financially support her child and did not testify to any plans to seek out employment. At the time of the hearing, her primary source of income was $304 that she received monthly in benefits from the State. (*Id.* at 785-786).

{¶54} Also, although Cheyenne was required to attend parenting classes, Smith testified that Cheyenne failed to timely pursue this objective. Specifically, Smith testified that she made seven referrals for parenting classes for Cheyenne throughout the pendency of the case. (July 29, 2020 Tr. at 518). However, Cheyenne did not act on those referrals in a timely manner and did not consistently

-28-

engage in parenting classes until sometime between the second and third days of the permanent custody hearing, which was approximately two years into the case and more than seven months since the Agency filed its motion for permanent custody.

{¶55} Furthermore, the record indicates that V.G. had a multitude of health and developmental challenges which required his caregiver to work with health care professionals and maintain a rigorous therapy and treatment program. Due to concerns about Cheyenne's substance use, she was not permitted to attend his therapy and medical appointments until she could demonstrate compliance with her own treatment plan. However, she had the option to request medical records for V.G. in order to monitor his development, health, and treatment programs. (Aug. 6, 2020 Tr. at 642). Unfortunately, Cheyenne did not take advantage of this option and when asked at the hearing what his current developmental challenges and goals were, Cheyenne was only able to answer about his speech difficulties. (*Id.*). Additionally, Cheyenne was aware that the barrier to her ability to attend V.G.'s appointments was compliance with the case plan, however, she did not pursue many of her case plan services until after the Agency filed for permanent custody. Accordingly, in light of Cheyenne's lack of compliance with her case plan objectives, we do not find that the trial court erred by determining that her lack of engagement in her own services demonstrated a risk that she was would not maintain V.G.'s services if he was placed in her care.

*Conclusion*

**{¶56}** After reviewing the trial court's findings in the light of the record and the testimony presented at trial, we find the Agency presented competent and credible evidence upon which the trial court reasonably formed a firm belief that permanent custody was warranted. *In re R.M.*, 2013-Ohio-3588, at ¶ 55. Accordingly, the trial court's decision granting permanent custody of V.G. to the Agency is not against the manifest weight of the evidence.

## Assignment of Error No. II

**The Agency failed to use reasonable efforts to reunify [Cheyenne] with her son.**

**{¶57}** In her second assignment of error, Cheyenne argues that the Agency failed to use reasonable efforts to reunify her with V.G. Specifically, Cheyenne contends that the Agency "deliberately worked against" her. (Appellate's Brief at 16).

*Applicable Law*

**{¶58}** "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 29. Under R.C. 2151.419, when a trial court

> removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * has made reasonable efforts to

> prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.

R.C. 2151.419(A)(1). R.C. 2151.419(A)(1) applies only at "'adjudicatory, emergency, detention, and temporary disposition hearings, and dispositional hearings for abused, neglected, or dependent children * * *.'" *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08, and 3-17-09, 2018-Ohio-125, ¶ 25, quoting *In re C.F.* at ¶ 41. R.C. 2151.419(A)(1) "makes no reference to a hearing on a motion for permanent custody." *In re C.F.* at ¶ 41. "Therefore, '[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *Id.*, quoting *In re A.C.*, 12th Dist. Clermont No. CA2004-05-041, 2004-Ohio-5531, ¶ 30. However, this does not relieve children services agencies of the duty to use reasonable efforts. *Id.* at ¶ 42. "If [an] agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at the time." *Id.* at ¶ 43.

*Analysis*

{¶59} The trial court made reasonable efforts determinations at the emergency custody hearing, the disposition hearing, and the hearing on the Agency's motion for extension of temporary custody and the trial court memorialized its reasonable efforts findings in its respective journal entries.

Further, the record reflects that the reasonable efforts determinations were made with the agreement of the parties. It was not until the April 9, 2019 status review hearing that the parents first challenged the trial court's reasonable efforts findings. (Doc. No. 133). However, at the August 27, 2019 hearing on the Agency's motion for a final extension of temporary custody, the trial court once again found that the Agency made reasonable efforts to prevent the continued removal of V.G. from his parents and memorialized this finding in its journal entry. (Doc. No. 151). Accordingly, because the Agency established that reasonable efforts have been made prior to the hearing on the motion for permanent custody, it was not required to prove, nor was the trial court required to find, that the Agency used reasonable efforts to reunify Cheyenne with V.G. before the trial court could grant permanent custody of V.G. to the Agency. *In re T.A.M.*, 3d Dist. Crawford No. 3-18-13, 2018-Ohio-5058, ¶ 16.

{¶60} Nonetheless, upon reviewing the record, we find that the trial court did not err by finding that the Agency made reasonable efforts to reunify V.G. with Cheyenne. At the permanent custody hearing, Smith testified to the efforts she made over the course of over two years to help the parents complete their case plan. (July 29, 2020 Tr. at 518-519). The efforts included providing Cheyenne referrals for parenting classes, mental health and drug treatment programs, drug and mental health assessments, and numerous referrals to local charities to provide food,

clothing, and personal care items. (*Id.*). Additionally, Smith transported Cheyenne to medication-assisted recovery programs, parenting classes, visitations, criminal court proceedings, and in-patient drug-treatment programs. (*Id.*). The Agency also supervised parenting time between Cheyenne and V.G. at their facility. (*Id.* at 519). Therefore, although the trial court was not required to make such a finding, we find that the Agency made reasonable efforts to reunify Cheyenne with V.G. in this matter. Accordingly, Cheyenne's second assignment of error is overruled.

### Assignment of Error No. III

**The trial court erred when it permitted [Cheyenne's] attorney to appear by telephone, over the objection of Father's counsel and the Agency's counsel, and without addressing [Cheyenne] if she consented to her attorney appearing over the telephone. This caused extreme prejudice to [Cheyenne] and violated her constitutional right to have counsel present at every hearing.**

{¶61} In her third assignment of error, Cheyenne argues she was denied the right to counsel because her trial counsel appeared by telephone during the first two days of the permanent custody hearing. Specifically, Cheyenne argues that because her trial counsel was not physically present in the courtroom during the first two days of the permanent custody hearing, she was denied her right to the effective assistance of trial counsel.

### *Standard of Review & Relevant Law*

{¶62} All parties in permanent custody proceedings are entitled to representation by legal counsel in all stages of the proceedings. R.C. 2151.352;

Juv.R. 4. "In permanent custody proceedings, where parents face losing their children, we apply the same test as the test for ineffective assistance of counsel in criminal cases." *In re E.C.*, 3d Dist. Hancock No. 5-15-01, 2015-Ohio-2211, ¶ 40. In order to demonstrate the ineffective assistance of trial counsel, one must first show that the trial counsel's performance fell below an objective standard of reasonableness. *Id.* at ¶ 41, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984) and *State v. Bradley*, 42 Ohio St.3d 136, 137 (1989). One must next demonstrate that, but for trial counsel's errors, the result of the proceeding would have been different. *Id.* If the petitioner cannot prove one of these elements, "it [is] unnecessary for a court to consider the other prong of the test." *State v. Walker*, 3d Dist. Seneca, 2016-Ohio-3499, ¶ 20. The appellant bears the burden of establishing ineffective assistance of trial counsel and, in order to do so, must overcome the strong presumption that licensed attorneys provided competent representation. *In re E.C.* at ¶ 41, citing *State v. Calhoun*, 86 Ohio St.3d 279, 289 (1999).

{¶63} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

**{¶64}** The failure to make either the deficiency or prejudice showing defeats a claim of ineffective assistance of counsel. *State v. Frye*, 10th Dist. Franklin Nos. 14AP-988 and 14AP-989, 2015-Ohio-3012, ¶ 11, citing *Strickland*, 466 U.S. at 697. Thus, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland* at 697.

**{¶65}** On March 9, 2020, the Governor of Ohio declared a state of emergency in the State of Ohio in response to the growing COVID-19 public health crisis. On March 27, 2020, the Governor of Ohio signed into law Am. Sub. 197, which temporarily adjusted statutory time frames. On March 27, 2020, the Supreme Court of Ohio promulgated a tolling order related to the COVID-19 pandemic. *See In re Tolling of Time Requirements Imposed by Rules Promulgated by the Supreme Court and Use of Technology*, 158 Ohio St.3d 1447, 2020-Ohio-1166 ("Tolling Order"). The Tolling Order, which was in effect during the first two days of the permanent custody hearing, expanded the use of technology in courtrooms. Subsection (C) of the Tolling Order provides:

> Any requirement in a rule of the Court that a party appear in person or requiring in-person service may be waived by the Court, local court, hearing panel, board or commission, as applicable. Appearance or service by use of technology may be allowed if it sufficiently

guarantees the integrity of the proceedings and protects the parties' interests and rights.

*Analysis*

{¶66} To the extent that Cheyenne argues she was not represented by counsel during the first two days of the permanent custody hearing because her trial counsel appeared telephonically, rather than in person, we reject her argument. Our review of the record reveals that although Cheyenne's trial counsel was not physically present in the courtroom during the first two days of the five-day permanent custody hearing, he was present telephonically during all testimony. The record reveals that Cheyenne's trial counsel consistently engaged in the proceedings, including cross-examining witnesses on Cheyenne's behalf. Furthermore, the trial court ensured that Cheyenne and Brendon's trial counsel were both able to communicate via text and email with Cheyenne's trial counsel. In fact, the record indicates that Cheyenne and Brendon's trial counsel sent "test" text messages to Cheyenne's trial counsel before beginning testimony on the first day of the hearing to confirm that they were able to communicate during the proceedings. Further, the record indicates that Cheyenne actually did electronically communicate with her trial counsel during the first two days of the permanent custody hearing. On several occasions, after the trial court observed Cheyenne sending messages on her phone, the trial court paused the proceedings to confirm Cheyenne's trial counsel received her communication.

Further, following one such communication, Cheyenne's trial counsel asked the witness on the stand an additional question. Accordingly, we find that Cheyenne was represented by trial counsel at all stages of the permanent custody proceeding.

{¶67} Having determined that Cheyenne was represented by counsel during the permanent custody proceedings, we now address her argument that her trial counsel was ineffective. In support of her contention that her trial counsel was ineffective, Cheyenne first argues that her trial counsel was ineffective per se because he appeared by telephone during the first two days of the permanent custody hearing. After considering the record and the totality of the circumstances, including the state of emergency and the tolling order expanding the use of technology in the courtrooms that was in place at the time of the permanent custody hearing, we do not find that Cheyenne's trial counsel's appearance by telephone during the first two days of the permanent custody hearing rendered him per se ineffective.

{¶68} Cheyenne further contends that she received ineffective assistance of trial counsel because: (1) the trial court failed to consider the alternatives to her trial counsel appearing by telephone, (2) her trial counsel was unable to assess witness credibility, (3) she did not have effective communication with her attorney, (4) her attorney was not able to strategize with Brendon's attorney, (5) her attorney could not spontaneously respond to questioning, (6) she and her attorney were not directly

consulted on the record regarding her trial counsel's appearance by telephone at the hearing, and (7) the hearing could have lasted only two days, in which case her attorney would not have been present in person during any part of the permanent custody hearing. However, Cheyenne fails to demonstrate how any of the alleged errors prejudiced her. Moreover, many of Cheyenne's alleged errors are directly contradicted by a review of the record. For instance, although Cheyenne argues her trial counsel was not able to spontaneously respond to questioning, the record indicates that her trial counsel was actively engaged throughout the proceedings and promptly responded to questions by opposing counsel and the trial court. Furthermore, although Cheyenne contends that she was unable to effectively communicate with her trial counsel when he was not present in the courtroom, as previously stated, the record indicates that she was able to electronically communicate with her attorney during the proceedings.

{¶69} In an attempt to demonstrate prejudice, Cheyenne argues that "without the guidance and regular communication with her counsel," she changed her position several times throughout the proceedings on whether she wished to be considered for permanent custody. However, Cheyenne's argument is misplaced. Indeed, Cheyenne's position regarding whether she wished to be considered for permanent custody of V.G. did change over the course of the proceedings. During the first day of the permanent custody hearing Cheyenne indicated that she wished

to be considered for permanent custody of V.G. (May 12, 2020 Tr. at 7). The record indicates that Cheyenne's decision to pursue permanent custody of V.G. was made after "a lengthy conversation in private" with her trial counsel on the previous day. (*Id.*). When Cheyenne testified during the fourth day of the permanent custody hearing, at which time her trial counsel was physically present in the courtroom, Cheyenne stated she was not in a financial position to support V.G. and she believed it was the child's best interest for the trial court to grant permanent custody of V.G. to Brendon. (Aug. 6, 2020 Tr. at 631, 648-650). Finally, when Cheyenne testified again at the final day of the permanent custody hearing, she indicated that she recently obtained stable housing and government financial assistance and wished to be considered for permanent custody of V.G. (Sept. 8, 2020 Tr. at 793). Cheyenne further indicated that, in the alternative, she would support the trial court granting custody of V.G. to Brendon, because she "just want[s] [V.G.] to be with one of his parents." (*Id.*).

{¶70} However, although Cheyenne's position regarding permanent custody shifted throughout the proceedings, there is no indication that her trial counsel's appearance by telephone during the first two days of the hearing was responsible for this change. To the contrary, the record reveals that her decision was made after consultation with her attorney and the changes in her position on permanent custody were made as a result of changes in her life circumstances, such as housing, rather

than her access to her attorney. Further, Cheyenne fails to demonstrate how her trial counsel's appearance by telephone altered her position on whether she wanted to be considered for permanent custody. Importantly, her trial counsel was physically present in the courtroom both times that she testified and was physically present when she testified that she believed it was in V.G.'s best interest to be placed with Brendon, rather than her. Accordingly, any suggestion by Cheyenne that her change in position was due to her trial counsel's appearance by telephone during the first two days of the hearing was in any way influenced by her trial counsel's appearance by telephone is undermined by the record. Moreover, Cheyenne has failed to indicate how the outcome of the proceedings may have been different if her trial counsel was physically present in the courtroom during the permanent custody proceedings. Thus, we do not find that Cheyenne was prejudiced by her trial counsel's telephonic appearance during the first two days of the permanent custody hearing.

{¶71} In conclusion, after reviewing the record in light of the totality of the circumstances, including the challenges presented due to the COVID-19 health crisis occurring during the time of the permanent custody proceedings, we do not find that Cheyenne received ineffective assistance of trial counsel.

{¶72} Cheyenne's third assignment of error is overruled.

**Assignment of Error No. IV**

**The trial court erred when it would not continue the hearing to either secure new counsel for [Cheyenne] or schedule it to a date that counsel felt comfortable being in the courthouse or put safeguards in place in the courthouse so [Cheyenne] had convenient access to her attorney at the courthouse.**

{¶73} In her fourth assignment of error, Cheyenne argues that the trial court erred by not continuing the permanent custody hearing to a later date when either (1) the trial court could secure new trial counsel for Cheyenne or (2) her trial counsel felt safe appearing in-person for the hearing and the courthouse had sufficient time to put appropriate safeguards in place.

*Standard of Review*

{¶74} "'Continuances shall be granted only when imperative to secure fair treatment for the parties.'" *In re Distafano*, 3d Dist. Seneca No. 13-06-14, 2006-Ohio-4430, ¶ 11, quoting Juv.R. 23. "'A decision by the trial court to deny a motion for a continuance is within the sound discretion of the trial court and should not be reversed absent a showing of abuse of that discretion.'" *Id.*, quoting *In re Miller*, 3d Dist. Auglaize No. 2-04-02, 2004-Ohio-3023, ¶ 7. The term "abuse of discretion" refers to a decision that is "arbitrary, unreasonable, or unconscionable." *Sandusky Properties v. Aveni*, 15 Ohio St.3d 273, 275 (1984).

*Relevant Law*

**{¶75}** "'"The review of a decision on a motion for continuance requires the appellate court to apply a balancing test, weighing the trial court's interest in controlling its own docket, including facilitating the efficient dispensation of justice, versus the potential prejudice to the moving party."'" *In re A.G.M.C.*, 3d Dist. Marion No. 9-10-30, 2010-Ohio-5188, ¶ 42, quoting *Gabel v. Gabel*, 3d Dist. Marion No. 9-04-13, 2004-Ohio-4292, ¶ 12, quoting *Burton v. Burton*, 132 Ohio App.3d 473, 476 (3d Dist.1999). In considering a motion for a continuance, a court should consider (1) the length of the delay requested; (2) whether other continuances have been requested and granted; (3) any inconvenience to parties, witnesses, opposing counsel, and the court; (4) whether the requested delay is for a legitimate purpose or is instead dilatory, purposeful, or contrived; (5) whether the defendant contributed to the situation that gives rise to the motion for a continuance; and (6) other relevant factors, depending on the unique facts of a case. *State v. Unger*, 67 Ohio St.2d 65, 67-68 (1981).

*Analysis*

**{¶76}** Here, Cheyenne attempts to argue that she was prejudiced by the trial court's decision denying Brendon's motion for a continuance of the permanent custody hearing to a later date. In support of her position, Cheyenne contends that because the trial court had the discretion to extend the permanent custody hearing

past the expiration of the 120-day requirement for good cause, it erred by failing to grant the parties' motions for a continuance.

{¶77} However, Cheyenne's argument is misplaced. Although Brendon and the Agency made oral motions to continue the permanent custody hearing to a later date when Cheyenne's trial counsel could be physically present in the courtroom, neither Cheyenne nor her trial counsel made a motion for a continuance. Consequently, proper application of the balancing test requires us to balance the trial court's interest in facilitating the efficient dispensation of justice with the potential prejudice of the *moving party* and would require us to balance the trial court's interests with the interests of Brendon and the Agency, as the moving parties. On appeal, the Agency concedes that the trial court did not err by denying its oral motion for a continuance. Moreover, Brendon is not a party to the current appeal and, therefore, any argument that the trial court erred by denying his motion for a continuance is not properly before this court. Accordingly, because Cheyenne is not the moving party, she is not the proper party to argue that the trial court erred by denying Brendon's and the Agency's motions. Thus, we cannot find that the trial court erred by denying Brendon's and the Agency's motions for a continuance.

{¶78} Cheyenne's fourth assignment of error is overruled.

{¶79} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Logan County Court of Common Pleas, Juvenile Division.

***Judgment Affirmed***

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**